# Exhibit S

   **TK News by …**   Give giftGift a subscription   

# The Lawyers Who Ate California: Part II

The Activision Case, and the beginning of Tesla. Taking a strategy imported from the Department of Labor, the DFEH launches a series of media-centric cases

🔒 Matt Taibbi    May 14    ♡ 531    💬 299    ⬆️



The failure of the federal case against Oracle had wide-ranging repercussions. For one thing, the firm moved its headquarters out of Redwood City to Austin, Texas within months of the judge's decision. Oracle announced a move in the same week as Tesla, which was destined to be targeted by some of the same lawyers who'd worked the Oracle case. CEO Elon Musk told the *Wall Street Journal* that California regulators had begun behaving like a "monopoly that

cannot go bankrupt," preaching a religion that "regulations are immortal," while adding the following acid commentary:

> *If a team has been winning for too long, they do tend to get a little complacent, a little entitled and then they don't win the championship anymore. California has been winning for too long.*

State officials responded to the departures of Oracle, Tesla, and other companies like Hewlett-Packard by claiming that a combination of irrational resistance to the state's strict COVID-19 laws and a reluctance by coddled white male executives to diversify was causing the exodus.

Eric Mellon, a spokesman for Democratic Governor Gavin Newsom, told *The Washington Post* that California's success was "not despite our progressive policies, but because of them… These are California's fundamental values, and we'll continue creating more jobs than any other state."

Newsom then nervously insisted there was nothing to worry about. He pointed to a new law offering restaurants and other small businesses more flexibility in expanding outdoor dining — "eat your heart out, Paris," he quipped — and reassured citizens the Silicon Valley departures were no big deal. "Our best days are in front of us," the governor said.

"The ironic thing is, he was about six months from becoming a target of all this himself," laughs one lawyer, referring to a state case that would soon far eclipse Oracle for sheer bile and bitterness.

"There's ugly," he added, "and then there's Activision ugly."

Way back on February 18th, 2018, *Fortune* magazine released its annual list of "100 Best Companies to Work For." Game giant Activision Blizzard made the list for the fourth straight year, with a *Fortune* survey claiming 95 percent of its employees said it was a "fun place to work." The firm's PR department giddily noted it also made the "Most Admired" and "Most Innovative" lists the year before. Coupled with $7 billion in revenues, the news sent their share price skyrocketing to an all-time high of $78.25, as executives appeared to have reached gamer nirvana.

That same month, the federal Equal Opportunity Employment Commission (EEOC) got an anonymous complaint from an employee of Blizzard Entertainment, a subsidiary of Activision Blizzard, alleging "a hostile work environment based on sex." The letter triggered a chain of events that within three years completely transformed Activision's reputation. The firm went

from "most admired" to shunned as the Freddy Krueger of workplaces, the living symbol of "toxic culture."

The *coup de grace* was a lawsuit filed by California's Department of Fair Employment and Housing, or DFEH, on July 21, 2021. It described the firm as a hellscape of "frat boy" antics in which male employees regularly came in hungover and blew workdays playing video games and joking about rape while women did all the work. Not merely uncomfortable, the Activision work environment was both deadly and perverse, as laid out in a crucial passage high in the complaint (emphasis mine):

> In a particularly tragic example, a female employee committed suicide during a business trip with a male supervisor who had brought **butt plugs and lubricant** with him on the trip…the deceased female employee **may** have been suffering from other sexual harassment… male co-workers were **alleged** to be passing around a picture of the deceased's vagina…

This filing was followed by a "bombshell" report in the *Wall Street Journal* entitled, "Activision CEO Bobby Kotick Knew for Years About Sexual-Misconduct Allegations at Videogame Giant." Expansively citing "people familiar with the matter," the *Journal* piggy-backed on details used by the DFEH, which really did sound shocking. It said the company's soft-spoken, khaki-clad CEO, Bobby Kotick, had presided over a vast empire of testosterone-driven predation, having failed to inform his board about "alleged rapes," and "intervened to keep" a male employee accused of harassment. The paper described one executive's particularly demeaning experience:

> She described a party for an Activision development studio she attended with Mr. Kotick around 2007 in which scantily clad women danced on stripper poles.

That the alleged rape from the lede of the *Journal* piece was reviewed by outside counsel understandably didn't impress reporters, but the fact that police declined to file charges should have been in any story about what the company did or didn't "know." The *Journal* put "police" up top — "The woman… reported one of the incidents to the police" — but tucked the crucial detail, "No charges were brought," at the bottom. Most subsequent reports that mentioned Activision in connection with rape left that element out, for instance here, here, here, and elsewhere.

As for the party the *Journal* wrote about involving "scantily clad women" who "danced on stripper poles"? A performance of Cirque Du Soleil, according to one source who attended the

event. When I asked the *Journal* about that and other issues, they said, "We stand by our fair and accurate reporting on Activision."

While the *Journal* was careful to say only that Kotick "knew" about "allegations," other outlets quickly followed with less equivocal headlines, like *GameInformer's* "[Report: Bobby Kotick Knew Of Activision Blizzard's History Of Sexual Misconduct](#)." In a literal sense, coverage only went from bad to worse. A site for users of role-playing games, *RPGFan*, even announced it was ceasing all reviews of Activision products, [saying](#) of the suit's claims, "Every bit of this could very well be as bad as it sounds, **or quite possibly worse**." The Communications Workers of America — a union that for years had been unsuccessfully attempting to unionize Activision offices — would refer to these press accounts of definite "[rampant sexual misconduct](#)" in letters to politicians demanding broader federal inquiries into potential criminal violations.

The initial DFEH complaint appeared to have been written specifically for reporters. If you read carefully, it didn't even allege a connection between a "butt plug" and an employee's tragic suicide, but the mere mention of this inflammatory and bizarre detail helped fuel the media panic.

As the press reported on the journey of the DFEH allegations through the courts, they over time acquired the character of facts, in a game of media telephone that helped inspire still more legal actions. In September, 2021, the SEC launched a probe into whether or not the firm "[properly disclosed allegations](#)." Next came a shareholder lawsuit that quoted the *Journal* article, [alleging](#) Kotick "didn't inform the Board of Directors about everything he knew," again about — allegations. The firm's share price [plunged](#) after each of the filings of the DFEH suit, the publication of the *Journal* article, and the launch of the SEC probe, and the once-ascendant firm appeared in freefall.

Maybe they deserved it! The video game industry after all is an infamous scourge of justice activists, driven as it historically has been by self-isolating, on-spectrum men raised in fantasy worlds of musclebound swordfighters and buxom warrior princesses. There's no shortage of documented stories of abuse, leering, and all-out grossness at gamer studios where male employees might outnumber women by a factor of five or even ten to one, to say nothing of the industry's reputation for Burger King wages and the uncompensated overtime phenomenon called "crunching." Activision furiously denied the pay equity accusations, insisting women earned $1.01 for every dollar men in the same positions made, but companies have lied before.

Meaning, the worst of the Activision horror tales could have been all or partly true. It's just that, because of the unique way the DFEH operates — mimicking the strategy of the OFCCP in the Oracle and Google cases — they didn't have to be. Corporate regulation often begins with an investigation and ends with a devastating headline, but California flipped the script, leading with the endgame in a new approach that appeared designed to "overwhelm companies at the point of allegation," as one lawyer put it.

"Listen, if you go into any company, particularly in this field, you're going to find some shit," one former civil rights regulator explains. "They all want to get off cheap, but most companies are willing to take their medicine. You carrot-and-stick them to get the number up. The carrot is the press release at the end that says they cooperated and moved their policies into the correct century. Most firms will pay a lot for that."

Stressing he had no personal knowledge of the Activision case, the ex-regulator added: "The difference with the DFEH is, there's no carrot. Even at settlement, it's all stick."

Like the OFCCP before it, the DFEH just five years ago was an agency with traditionally more modest aims, a bane of slumlords and strip club owners that took thousands of calls a year and litigated only in the rarest of cases. In 2017 it received 24,779 complaints and investigated 6,160, out of which it litigated a grand total of 35 cases, for a total return of $12.9 million. The agency then was proud to announce five-figure settlements for a 64-year-old Latina cook told she was too old, a Kit Kat Bar waitress fired for getting pregnant, a woman at a flower farm whose male co-workers were "staring, leering, winking and licking their lips," and so on.

Then in 2018 the DFEH hired Wipper, who left federal office before the conclusion of the Oracle and Google cases. The "compelling evidence of very significant discrimination against women" cited in the OFCCP's Google case ended up being worth just $527 in back pay per female employee. The DFEH would soon launch another investigation of Google just as the federal case was settling, this time for alleged mistreatment of black female employees. But the signature DFEH case was destined to be Activision.

A DFEH harassment suit against Activision was never supposed to happen. State and federal civil rights agencies typically divide work, to avoid duplicate investigations. By tradition, the agency with the "earliest charge" — in this case the EEOC, which received the initial

complaint — leads the probe. As such, the Director of the EEOC's Los Angeles District office, Rosa Viramontes, entered into a workshare agreement with DFEH Director Kevin Kish on October 2, 2018, under which the EEOC would investigate harassment claims, and the DFEH would investigate discrimination and pay equity issues.

Over the course of years this simple deal — us harassment, you pay equity — was repeatedly memorialized. The EEOC and the DFEH agreed to "coordinate during the investigation," with the EEOC investigating "the harassment allegations" and the DFEH "taking the lead" on pay and promotion. As late as June 4, 2020, Wipper sent an email to Viramontes. "Rosa," she wrote. "To confirm our discussion, DFEH is not conducting the investigation of the harassment allegations in this matter… Janette."

> Rosa,
>
> To confirm our discussion, **DFEH is not conducting the investigation of the harassment allegations in this matter**
>
> Please let me know if you need further information.
>
> Janette

Something soon went awry between California and the feds, however. On August 27, 2020, Wipper wrote to Viramontes asking her "not to inform defendants of the Interagency agreement." California apparently didn't want the EEOC to answer company questions about which agency was investigating what.

The EEOC, proceeding under the belief that it was doing the harassment case, wrapped up its investigation nearly a year later, on June 15, 2021. Though generally panned in the press as a massively insufficient wrist-slap, their investigation didn't acquit Activision Blizzard, either, concluding it "engaged in unlawful practices" by subjecting "certain employees" to "sexual harassment, pregnancy discrimination, or related retaliation" under Title VII of the Civil Rights Act. The gory details weren't made public and they agreed to settle with Activision for $18 million, obviously not a huge sum for such a firm. A consent decree was later signed by a Republican-appointed judge named Judge Dale Fischer, who called it "fair, reasonable, and adequate."

California clearly didn't agree. The instant the EEOC informed the DFEH it was settling, it became obvious the DFEH had already decided to toss out the workshare agreement and pursue its own case. Wipper now wrote to Viramontes that same day of June 15, 2021,

announcing that, sorry, we're going to investigate harassment after all. Her reasoning, never brought up before, was that California law "provides Californians with much broader legal protections," including "coverage of interns and contractors," and "uncapped damages," among other things.

Actually, the more stringent California harassment laws had come up at least one other time, according to the public record. On June 2, 2020, Wipper wrote to Viramontes saying her agency might look into a "separate claim" under California's Fair Equity and Housing Act (FEHA), under which "an employer is required to take all reasonable steps to prevent discrimination."

Wipper was writing in response to an email the day before from a confused-sounding Viramontes, who must have heard the DFEH was investigating something involving harassment and asked in despair, "What is failure to prevent discrimination?" She added: "We need clearer answers before moving forward." Wipper wrote in a reassuring tone that the state was merely investigating something not covered by federal law, but not to fret, it wasn't planning on monetizing the claim. "The DFEH may independently seek **non-monetary** preventive remedies" under that statute, she said.

A year later, all such niceties were off the table, and soon California was not only telling the EEOC it was going after bigger "remedies," but also that it planned on trying to block the apparently insufficient federal settlement. "We expect that you agree that California workers should not be deprived of these greater rights," Wipper wrote, in the summer of 2021.

The state soon after formalized this decision via a series of motions to intervene to block the federal deal, essentially hoping to replace it with its own bigger, badder settlement.

Activision's latest motion makes clear what the company thinks happened. The firm says it cooperated with the parallel DFEH pay equity and EEOC harassment investigations for two years, in what they believed was a "routine" process that was only upended when the EEOC surprised California by announcing it was ready to settle. "Apparently recognizing that the pay and promotion claims it had agreed to investigate under the Interagency Agreement were unlikely to generate significant media interest or claims value," the motion reads, "DFEH suddenly changed course and abandoned [California's Fair Equity and Housing Act's] mandated procedure in a rush to file suit."

This furious scramble to block the EEOC followed a pattern of aggressive efforts by the DFEH to elbow out other claimants in other cases. With Riot Games in 2019, it stepped in to

block a $10 million class action settlement, then a record, saying the women involved were entitled to more like $400 million in back pay (they were right up to a point, and ultimately settled for $100 million). They also demanded the company hand over the contact information of roughly 100 women who had settled confidentially with Riot over the years, which according to one lawyer would have been interpreted by management as an effort to re-litigate settled claims. In the Activision case, soon after the DFEH sent its "back off" letter to the EEOC, the agency sent a letter to Activision employees, warning them not to get their own lawyers because "it is unnecessary" and "a private attorney would have to file suit in your name." The agency even told employees to "please let us know if an attorney attempts to solicit your business."

The wildest example of the DFEH's zeal for claims came in a still-pending racial discrimination case involving Tesla. In that case, the state agency offered to negotiate with the firm, on an unusual condition. "The DFEH," they wrote, "is willing to mediate… on the condition that Tesla confirms that no other settlement related to the allegations in DFEH Director's Complaint… will be reached." According to Tesla's lawyers, the DFEH went further:

> *In subsequent communication, DFEH then mandated a gag order that Tesla not "discuss" or even "contemplate" settlement with the EEOC, or DFEH mediation would proceed the very next day.*

It takes gumption for an agency to demand a gag order preventing a corporation from talking to federal investigators, but the DFEH in recent years has not lacked in the stones department. The timeline leading to the filing of the DFEH's harassment suit shows this. On June 23rd, 2021, the EEOC's Viramontes confronted Wipper in an email about the workshare dispute, telling Wipper that "the EEOC suspected that DFEH had begun to investigate sexual harassment" in defiance of their agreement.

Viramontes was a little off. According to the just-filed Activision motion, the DFEH hadn't just begun investigating the company for harassment by the time Viramontes aired her suspicions, it was already finished doing so, or at least claimed as much. Despite having set a date for later that year, in December of 2021, to mediate with Activision, it announced on June 24th, 2021 that it, too, had "completed its investigation" and now had "reason to file a civil complaint…against Activision Blizzard." It didn't file a full suit at this time, but submitted a "cause letter" essentially announcing its readiness to go forward without specifying over what. Activision's new motion describes the tactic, which again, sounds strikingly like the Oracle case:

> *DFEH's June 24, 2021 Cause Letter provided no cause, at all. It contained no description of what claims might be at issue (pay, promotion, or otherwise), what alleged unlawful practices had occurred as to what employee or group of employees... The Cause Letter offered "mandatory dispute resolution" with an internal DFEH mediator on either Thursday or Friday, July 1 or 2—seven and eight days, respectively, after the letter was sent... To allow for good-faith mediation, Activision Blizzard sought information from DFEH regarding the claims the agency wished to mediate. DFEH did not provide any such information.*

In any case, the end result in the Activision affair was that the firm found itself sued and answering questions in media about butt plugs and suicide before it even knew what it was being accused of. This was pretty far from any mandate to "resolve the dispute without litigation."

Tesla, the clean energy carmaker run by would-be Twitter conqueror Elon Musk, is also caught up in a shockingly bloody war with the Golden State.

The company at the end of April claimed DFEH pulled the same stunt Activision complained of, saying the agency investigated, learned another set of lawyers appeared to have a juicier-sounding case than they did, and bigfooted their way into that other claim, going public with explosive allegations seemingly at the last minute without regard for their impact. Echoing other complaints about the use of outside counsel, Tesla said DFEH initially announced that it was investigating racial harassment and other claims, then "'abruptly abandoned its 'investigation,' rushing to file on the back of — and based entirely on — private litigation brought by plaintiffs' counsel," who were then brought into the suit.

The Tesla case makes the "butt plug" complaint seem like child's play. It described the firm's Fremont plant as "racially segregated" and a "slave ship," claimed one black employee was told, "You're eating watermelon, that's why you're lazy," and that employees were subjected to "supervisors directly calling them the n-word throughout the day." Powerful stuff, and bold, given that, as Tesla has repeatedly pointed out (and the DFEH hasn't denied), the DFEH filed this complaint "without ever stepping foot in the Fremont facility."

I reached out to both parties to confirm that the DFEH was alleging white-on-black harassment and to ask why, if that were true, more hadn't been done. If there were indeed managers directly calling workers the n-word on a "constant" basis at Fremont, it seems like Tesla shouldn't be waiting to act and the DFEH should be working with the firm to identify those figures immediately.

The DFEH again didn't respond. The company in response only said the following:

> *The Fremont factory has a majority-minority workforce and provides the best paying jobs in the automotive industry to over 30,000 Californians.*
>
> *Over the past five years, the DFEH has been asked on almost 50 occasions by individuals who believe they were discriminated against or harassed to investigate Tesla. On every single occasion, when the DFEH closed an investigation, it did not find misconduct against Tesla.*

The DFEH does dispute the idea that they found insufficient reason to investigate on 50 previous occasions. "It is unclear which administrative complaints Tesla refers to, but many resulted in an immediate request for a right to sue," they wrote, in one court document. I was unable however to find record of previous DFEH actions for this kind of harassment at the Fremont plant.

Overall, with the DFEH's stress on anecdotal charges upfront, it is "trickier for companies to be super combative with the agency because you have these concrete personal stories that are driving the enforcement action," said University of California law Professor Jodi Short.

Meanwhile, on March 29th of this year, just as Herold was stepping down from the DOL, Wipper was fired from the DFEH without explanation, in "the midst of her success," as her lawyer put it. On the same day, a judge rejected the DFEH's attempt to block the EEOC's settlement with Activision, a decision that enraged social justice activists, who felt the company was getting off cheap. One proverbial "person familiar with the matter," however, relayed a comment on Wipper's departure: "When was the last time you heard of a state official being *fired*?" Another official, Anna Park of the EEOC, told the *Washington Post*, "You don't get to double dip," she said. "That's the reality of these settlements."

A Democrat-on-Democrat melee ensued over Wipper's firing, with the state's milquetoast JV governor Newsom taking the place of the companies and even villainous names like Scalia as a prime media target. Wipper's lawyer announced that, like Herold, she was considering a whistleblower claim, essentially accusing the governor of succumbing to pressure from the powerful. "For there to be justice, those with political influence must be forced to play by the same set of laws and rules," read the statement.

Even worse, a deputy to Wipper resigned — in some cases the resignation was reported as coming on the official's "last day" — and on the way out, this deputy released an email strongly suggesting that Newsom and Activision were in cahoots. Newsom, the outgoing

deputy wrote, had "repeatedly demanded advance notice of litigation strategy and next steps in the litigation," in behavior that "mimicked the interests of Activision's counsel." The complaint was strikingly similar to the one made against Scalia at the end of the Oracle case, except the evil corrupt scumlord was now boring old Gavin Newsom, not Antonin Scalia's son. A spokesperson for Newsom responded by saying, "Claims of interference by our office are categorically false."

So much for "Eat your heart out, Paris." The state was devouring itself.

Next: *"Go anywhere but West, young man."*

♡ 531        💬 299        ⬆ Share

Write a comment…

**Pamela G Morgan** · May 14
This a great example of why we subscribe. Wonderful, thorough, actual careful reporting! You are the real deal, Matt, and I wish newsrooms would bring you or at least your articles in to show peop,people, how it's done.
♡ 135   Reply   ⋯

6 replies

**Joseph Carroll**  Writes Steward  · May 14
Our once productive nation has been riddled with cancerous parasites. Parasites & looters go where the money is. Since they have nothing valuable to offer, they scheme & plot all sorts of nefarious ways to get at what they could not earn in a free market. Expect the same band of looters & parasites to eventually flock to Texas and take up residence there, after California has completed its descent into a permanent hellhole.
♡ 96   Reply   ⋯

83 replies

**297 more comments…**

© 2022 Matt Taibbi ∙ Privacy ∙ Terms ∙ Collection notice

Publish on Substack     Get the app

Substack is the home for great writing